UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | |
|---|---|
| TIMOTHY D. WALKER et al., | : |
| | : |
| Plaintiffs, | : |
| | : |
| v. | :   No.  3:04cv1477 (MRK) (LEAD) |
| | : |
| CITY OF WATERBURY et al., | : |
| | : |
| Defendants. | : |

**MEMORANDUM OF OPINION**

Plaintiffs in this case are firefighters who allege that their employer, the City of Waterbury ("the City"), deprived them of their right to substantive due process and equal protection under the Fourteenth Amendment by altering the terms of their retirement benefits. They bring this lawsuit under 42 U.S.C. § 1983, seeking money damages, attorneys' fees, and costs as a result of the claimed violation of their constitutional rights. This case has been considered, though not formally consolidated, with *Laccone v. City of Waterbury*, 3:04-CV-2139 (MRK) and *Brown v. City of Waterbury*, 3:05-CV-870 (MRK), in which other municipal employees also sue the City for similar conduct.

On May 18, 2005, the Court ordered Plaintiffs in *Walker* and *Laccone* to join the Waterbury Financial Planning and Assistance Board ("the Oversight Board" or "the Board") as a defendant, having found that the Oversight Board was a party that should be joined if feasible under Rule 19 of the *Federal Rules of Civil Procedure*. The Court assumes familiarity with its May 18, 2005, decision [doc. # 47]. *Brown* was initiated on June 2, and Plaintiffs named the Oversight Board as

a defendant. Now a defendant in all three cases, the Oversight Board has moved to dismiss the action as to itself on the ground that it is a state agency. As a consequence, the Board asserts that this action is barred by sovereign immunity under the Eleventh Amendment of the United States Constitution, and also that the Board is not a "person" within the meaning of 42 U.S.C. § 1983. *See* Motions to Dismiss [*Walker* doc. #64]; [*Laccone* doc. #38]; [*Brown* doc. #21]. For the following reasons, the Court agrees that the Oversight Board is a state agency, and therefore grants the Oversight Board's motions to dismiss.

## I.

Under the Eleventh Amendment, as construed by the Supreme Court, federal courts lack jurisdiction to entertain suits against non-consenting states. *See Seminole Tribe of Florida v. Florida*, 517 U.S. 44, 54 (1996). And this is true whether the plaintiff chooses to sue the state itself or an arm of the state, such as a state agency. *See Posr v. Court Officer Shield No. 207*, 180 F.3d 409, 414 (2d Cir. 1999). Thus, the parties agree that the operative issue on the Oversight Board's motion is whether it is a state agency, for if it is, this Court lacks subject matter jurisdiction over the claims against it.[1] "On a motion invoking sovereign immunity to dismiss for lack of subject matter jurisdiction, the plaintiff bears the burden of proving by a preponderance of evidence that jurisdiction exists." *Garcia v. Akwesasne Hous. Auth.*, 268 F.3d 76, 84 (2d Cir. 2001). While materials extrinsic to a complaint are not typically considered on a motion to dismiss, a defendant who challenges the court's subject matter jurisdiction "may use affidavits and other additional matter to support the motion. Conversely, the plaintiff may establish the actual existence of subject matter jurisdiction

---

[1] Plaintiff does not claim that the State has consented to suit or that Congress has abrogated the State's Eleventh Amendment immunity.

through extra-pleading material." 5B Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure* § 1350, at 159-60 (3d ed. 2004); *see Zappia Middle East Const. Co. Ltd. v. Emirate of Abu Dhabi*, 215 F.3d 247, 253 (2d Cir. 2000) ("On a Rule 12(b)(1) motion challenging the district court's subject matter jurisdiction, the court may resolve the disputed jurisdictional fact issues by referring to evidence outside of the pleadings, such as affidavits . . . ."). Therefore, the Court derives all facts in this opinion from documents, affidavits, and other materials submitted by the parties regarding the present motion.[2]

The Oversight Board was created by Special Act 01-1 ("the Special Act" or "the Act"), which was passed by the Connecticut General Assembly and signed by the Governor on March 9, 2002. *See* Defendant Waterbury Financial Planning and Assistance Board's Memorandum of Law in Support of Motion to Dismiss [doc. #65] Ex. A [hereinafter Special Act]. According to the Special Act, it was enacted to address "a financial emergency [that] exist[ed] with regard to the city of Waterbury, . . . the continued existence of [which] is detrimental to the general welfare of the city and the state." *Id.* § 1.[3] The Supreme Court of Connecticut has described the circumstances that led

---

[2] In connection with this motion, Plaintiffs deposed Robert Dakers, who filed an affidavit on behalf of the Oversight Board.

[3] The complete text of Section 1 of the Special Act reads as follows:

It is hereby found and declared that a financial emergency exists with regard to the city of Waterbury, that the continued existence of this financial emergency is detrimental to the general welfare of the city and the state, that the city's continued ability to borrow in the public credit markets and the resolution of this financial emergency is a matter of paramount public interest and that to achieve this resolution it is necessary, appropriate and an essential public purpose to provide in this act for the financing of deficits resulting from the city's operations, the imposition of financial management controls and the creation of the Waterbury Financial Planning and Assistance Board to review the financial affairs of the city of Waterbury, all in order to achieve or maintain access to public credit markets, to fund the city's

to the adoption of the Special Act as follows:

> In 2001, as a result of many years of gross fiscal management, the city [of Waterbury] was in a state of financial crisis. Specifically, the city had underfunded its pensions for years and was paying its pension liabilities out of the city's general fund. In addition, the city had been paying health care benefits, the cost of which were rapidly rising, out of the city's general fund. As a result of these and other liabilities, the city's bond rating had been downgraded. The crisis threatened not only the city, but also the fiscal reputation of the state, which acts essentially as a guarantor of certain of the city's obligations.

*Local 1339, Int'l Assn. of Firefighters v. Waterbury*, 274 Conn. 374, 382 (2005) (internal quotations and citations omitted).

Several provisions of the Act created the Oversight Board and invested it with the power to supervise the City's budget, its financial obligations and bond issuances, its collective bargaining agreements, and other contractual and financial matters. *See id.* §§ 10-12, 14-19, 23. As the Connecticut Supreme Court has described the legislation, "In accordance with the special act, the city was required to undertake certain fiscal and management controls. As a further measure, the legislature created the oversight board to ensure that order was restored to the city's finances." *Local 1339*, 274 Conn. at 382 (internal quotation marks omitted).

Exercising the powers granted to it under the Special Act, the Oversight Board issued an arbitration award that made changes to the retirement and health benefits of certain municipal employees in the City of Waterbury. In *Walker*, a firefighter sued the City, alleging that the alteration of retirement benefits violated his due process and equal protection rights. *See* Complaint [*Walker* doc. #1]. Twenty-eight more firefighter plaintiffs joined that lawsuit, *see* Ruling and Order [*Walker* doc. #19], and eventually that case was consolidated with three others that also involved

---

accumulated deficits and to restore financial stability to the city of Waterbury.

Waterbury firefighters, *see* [*Walker* doc. #26] (consolidating *Walker* with *Cruz v. City of Waterbury*, 4-CV-1799; *Burns v. City of Waterbury*, 4-CV-1800; and *Fischetti v. City of Waterbury*, 4-CV-1801). In *Laccone*, 139 members of the Local 353 of Council #4 of the American Federation of State, County, and Municipal Employees ("Local 353") sued the City and Local 353, alleging a conspiracy to deprive plaintiffs of their retirement benefits. *See* Complaint [*Laccone* doc. #1].

On May 18, 2005, the Court issued a Memorandum of Decision in which it denied without prejudice the City's motion to dismiss this case for failure to join an indispensable party and ordered the parties to join the Oversight Board in *Walker* and *Laccone*. The Court declined to decide at that stage whether the Board was a state agency – and thereby immune from suit – because the Court lacked the facts necessary for that determination and the Court believed that the Board itself would be in the best position to address those facts and to assert any Eleventh Amendment immunity to which it believed it was entitled. Accordingly, the Court ordered the plaintiffs in each case to add the Board as a party defendant, and ordered the *Walker* plaintiffs to add the firefighters' union as a party defendant. *See* Memorandums of Decision [*Walker* doc. #47]; [*Laccone* doc. #21]. Amended complaints were filed in both suits, each naming the Oversight Board as a defendant. *See* Amended Complaints [*Walker* doc. #54]; [*Laccone* doc. #22]. Later, five additional municipal employees brought a separate suit against the City and the Oversight Board, *see* Complaint [*Brown* doc. #1], later adding the Waterbury City Employees Association as a defendant, *see* Amended Complaint [*Brown* doc. #7]. Now a defendant in three suits – *Walker*, *Laccone*, and *Brown* – the Oversight Board has filed identical motions to dismiss in all three cases. *See* Motions to Dismiss [*Walker* doc. #64]; [*Laccone* doc. #38]; [*Brown* doc. #21].

5

## II.

The Oversight Board asserts that it is an "arm of the state," and therefore that this lawsuit against it is barred by the Eleventh Amendment. Plaintiffs respond that the Oversight Board is, instead, an "extension of the City" subject to liability under 42 U.S.C. § 1983. Both sides agree that the Oversight Board's status is governed by the six-factor test described in *McGinty v. New York*, 251 F.3d 84 (2d Cir. 2001).[4] Under this test, whether an entity is to be considered an arm of the state for purposes of Eleventh Amendment immunity depends on:

> '(1) how the entity is referred to in its documents of origin; (2) how the governing members of the entity are appointed; (3) how the entity is funded; (4) whether the entity's function is traditionally one of local or state government; (5) whether the state has a veto power over the entity's actions; and (6) whether the entity's financial obligations are binding upon the state.'

*Id.* at 95-96 (quoting *Mancuso v. New York State Thruway Authority*, 86 F.3d 289, 293 (2d Cir. 1996)). "If these factors point in one direction, the inquiry is complete. If not, a court must ask whether a suit against the entity in federal court would threaten the integrity of the state and expose its treasury to risk. If the answer is still in doubt, a concern for the state fisc will control." *McGinty*, 251 F.3d at 96 (internal citation omitted). Accordingly, the Court examines the six *McGinty* factors:

**A.    How the entity is referred to in its documents of origin.**

While the question whether a particular entity is an "arm of the state" for purposes of the Eleventh Amendment is a question of federal law, that federal question can be answered only after considering how state law defines the character of the entity in question. *Regents of the Univ. of*

---

[4] As *McGinty* recognized, these factors were identified in *Feeney v. Port Auth. Trans-Hudson Corp.*, 873 F.2d 628, 630-31 (2d Cir. 1989), and are derived from the Supreme Court's decision in *Lake Country Estates, Inc. v. Tahoe Regional Planning Agency*, 440 U.S. 391, 401-02 (1979). *McGinty*, 251 F.3d at 95.

*Calif. v. Doe*, 519 U.S. 425, 429 n.5 (1997); *see Mancuso*, 86 F.3d at 293. The Special Act does not explicitly describe the Oversight Board either as a state agency or as a political subdivision. However, the first sentence of the provision creating the Oversight Board states: "There is hereby created the Waterbury Financial Planning and Assistance Board which shall be in the Office of Policy and Management for administrative purposes only." Special Act § 10(a). The Act also states that the Board "shall adopt its own procedures for the conduct of its meetings and exercise of its powers, duties and functions conferred upon it by this act." *Id.* § 10(b). Section 10(b) goes on to expressly exempt the Board from "chapter 54 of the general statutes" – Connecticut's Uniform Administrative Procedures Act (UAPA) – which governs the conduct of state agencies, including "each state board, commission, department or officer." Conn. Gen. Stat. § 4-166(1). There would have been no need for the General Assembly to adopt this explicit exemption unless the legislature believed the UAPA would otherwise apply to the Oversight Board. *Cf. State v. Murray*, 254 Conn. 472, 492 (2000) (observing that statutes should be read in a manner that avoids rendering terms surplusage).

  Having considered the terms of the Special Act, Connecticut courts have repeatedly described the Oversight Board and related entities as state agencies. For example, the Connecticut Supreme Court recently stated, without qualification, that "[t]he oversight board is a state agency." *Sch. Adm'rs of Waterbury v. Waterbury Fin. Planning and Assistance Bd.*, 276 Conn. 355, 358 (2005). Furthermore, the Special Act "deemed [the Board] to be the successor to the [Waterbury] Budget Advisory Council," Special Act § 10(d), which was held by a Connecticut Superior Court to be a state agency immune from suit, *see Waterbury Firefighters Assoc., Local 1339 v. Waterbury Budget Advisory Council*, No. CV020174905, 2004 Conn. Super. LEXIS 1856, at *9 (July 13, 2004). A

Superior Court has also described an analogous entity, the West Haven Finance Planning and Assistance Board, as "a state agency."  *See AFSCME, Council 4, Local 681, AFL-CIO v. West Haven*, 43 Conn. Supp. 470, 481-82 (Conn. Super. Ct. 1994).

Thus, the first *McGinty* factor points strongly toward granting immunity to the Oversight Board.  *See McGinty*, 251 F.3d at 96 ("New York's highest court tells us how New York courts view the Retirement System, and because plaintiffs point to no contrary authority, this factor favors granting immunity to the System.").

**B.     How the governing members of the entity are appointed.**

The Oversight Board consists of the following members: the Secretary of the Connecticut Office of Policy and Management (OPM) or the secretary's designee; the State Treasurer or the treasurer's designee; the mayor of Waterbury; and four other members appointed by the Governor.  Special Act § 10(a).  The Treasurer is elected by a statewide vote, *see* Conn. Const. art. IV, § 1, and the OPM Secretary is appointed by the Governor with the advice and consent of either chamber of the General Assembly, *see* Conn. Gen. Stat. § 4-65a(a).  All Board members are required to file statements of financial interest with the Office of State Ethics, a requirement imposed on members of state agencies but not on members of municipal boards or agencies.  *See* Supplemental Memorandum of Law in Support of the Waterbury Financial Planning and Assistance Board's Motion to Dismiss [*Walker* doc. #76] Dakers Affidavit ¶ 11 [hereinafter Dakers Aff.].  Because the Governor appoints five of the seven members of the Board, and the sixth is elected in a statewide vote, the second *McGinty* factor also strongly favors immunity.  *See McGinty*, 251 F.3d at 96; *Mancuso*, 86 F.3d at 295.

### C.     How the entity is funded.

The third *McGinty* factor is less straightforward than the previous two.  Under the Special Act:

> All expenses of the board, including any staff, consultants, and implementation costs of any consultant studies adopted by the board in accordance with this act, shall be paid by the city and may be paid from the proceeds of any deficit funding bonds or interim funding obligations issued pursuant to this act.

Special Act § 10(c).  As a practical matter, the Oversight Board's expenses are initially paid for by the State.  Dakers Aff. ¶ 17.  The Board submits quarterly reimbursement requests to the City, and the City's Finance Department processes these requests and then "remits payment in the form of a check made payable to the State Treasurer."  *Id.* ¶ 18.  Board members serve without compensation.  Special Act § 10(c).  However, since two of the Board's members – the OPM Secretary and State Treasurer[5] – are paid their wages by the State, the State can be said to subsidize the portion of their time devoted to Board activities.  Conversely, the City can be said to subsidize the Mayor's Board-related work, since the City pays the Mayor's salary.   For "expenses incurred in performance of their duties," *id.*, Board members are entitled to reimbursement from the State, which would then be entitled to reimbursement from the City.  But apart from meals at arbitration hearings, no reimbursements have been sought.   *See* Brief in Opposition to Motion to Dismiss of Waterbury Financial Planning and Assistance Board [*Walker* doc. #87] Dakers Deposition at 15-16 [hereinafter

---

[5] As noted above, the Special Act provides that the OPM Secretary and State Treasurer may appoint a designee to serve on the Board in their stead.  As of the date of this opinion, the OPM Secretary and State Treasurer had chosen to serve personally.  *See* Waterbury Financial Planning and Assistance Board, http://www.opm.state.ct.us/igp/WaterburyFPAB/wfpab.htm (last visited Feb. 13, 2006).  The Court has received no information as to whether or how the Board's composition may have changed during the course of its existence.

Dakers Deposition].

The salaries of Board staff are also paid initially by the State and later reimbursed by the City. Robert Dakers is the Assistant Director of Municipal Finance Services in the Intergovernmental Policy Division of OPM, and he also serves as a staff member for the Oversight Board. Dakers Aff. ¶¶ 3, 6. Mr. Dakers's salary is paid by the State, but the City reimburses the State for the portion of his salary and benefits attributable to time spent working on Board-related matters. Dakers Depo. at 7-9. Mr. Dakers does not participate in the City's retirement or pension plans, nor does he receive employment benefits from the City. Dakers Aff. ¶ 10. In this action, the Attorney General retained private counsel to provide legal representation to the Oversight Board; counsel's fees are paid by the State, which is then reimbursed by the City.

For administrative functions, hearings, and meetings, the Oversight Board uses office space at the OPM's Hartford offices and in the Rowland State Government Center in Waterbury, Connecticut. *Id.* ¶ 19. The Board maintains no day-to-day presence at the Waterbury City Hall. Dakers Depo. at 12. The City does not reimburse the State "for the cost of office space or conference room use, or for related costs such as electricity, telephone, heating/air conditioning, water, or central administrative support provided to the Oversight Board by OPM." Dakers Aff. ¶ 20. Nor is reimbursement provided for State-purchased computers, software, or office furniture, fixtures, or equipment. *Id.* ¶ 21.

In sum, the third *McGinty* factor is somewhat mixed. The Special Act provides for reimbursement by the City of all Oversight Board expenses, yet not all expenses have been reimbursed. Staff salaries are paid by the State and reimbursed by the City, but Board members receive no compensation (apart from normal government salaries for ex officio members). And

office-related expenses – such as the costs of office space, utilities, computers, and equipment – are absorbed fully by the State. The Court received no information regarding the percentage of the Board's expenses that have ultimately been reimbursed by the City. Presumably, the ratio has not remained static over time, as salary-related expenses have diminished in comparison to fixed expenses such as the cost of office space. *See* Dakers Depo. at 8-9 (noting the declining percentage of Mr. Dakers's time devoted to Board-related matters and the corresponding decrease in salary reimbursement from the City); *id.* ("Recently my percent of my pay being reimbursed by the City would drop to 75 percent. That's as of July 1. It will go down to 50 percent on January 1 . . . ."). The Court is thus left to speculate as to what portion of the Board's on-going funding is paid by the State. *See Mancuso*, at 86 F.3d at 295 ("[T]he arm-of-the-state doctrine focuses not on initial funding, but on current funding.").

Based upon the facts presented, the Court concludes that the third *McGinty* factor neither favors nor disfavors immunity. *See Chafetz v. Roosevelt Island Operating Corp.*, No. 97 Civ. 0761, 2000 WL 1277337, at *3 (S.D.N.Y. Sept. 8, 2000) (finding that the third *McGinty* factor "does not weigh either in favor of or against immunity" because "the record on this motion is unclear as to whether [the entity in question] has actually received appropriations from the State in recent years").

**D.     Whether the entity's function is traditionally one of local or state government.**

The Special Act was enacted in response to the City's financial crisis, which the legislature deemed to be "detrimental to the general welfare of the city *and the state*." Special Act § 1 (emphasis added); *see Sch. Adm'rs of Waterbury*, 276 Conn. at 365 ("The crisis threatened not only the city, but also the fiscal reputation of the state, which acts essentially as guarantor of certain of the city's obligations." (internal quotation marks omitted)); *cf. McGinty*, 251 F.3d at 97 (finding

11

relevant the fact that a state court had described the entity in question as "assist[ing] and promot[ing] the efficient operation of the affairs of the state itself"). The Act grants the Board expansive authority, empowering it to, among other things: review and approve or reject the City's budget and financial plans; set the terms of the City's collective bargaining agreements; force the City to implement cost-reducing measures; act as a binding arbitration panel in any labor contracts subject to binding arbitration; and override "any action or decision of the mayor, Board of Alderman or other city employee [that] affects the economic viability of the city." Special Act §§ 11-12.

The Oversight Board's powers might be characterized in two drastically different ways. On one hand, the Board can be described as exercising traditional local functions like budget-setting, cost-trimming, and contract negotiating. On the other hand, the Board has nearly unbridled authority to monitor and override the decisions of the City. The Board thus acts in an oversight capacity, which is traditionally a state function and not a local one. Moreover, its expansive powers are unlike those possessed by any local entity. As the Connecticut Supreme Court has stated, "'The extent of the authority conferred on the [oversight] board is nothing short of extraordinary.'" *Sch. Adm'rs of Waterbury*, 276 Conn. at 366 (alteration in original) (quoting *Local 1339*, 274 Conn. at 383). Indeed, the Special Act authorizes the sort of control over the City's affairs that Connecticut's Home Rule Act normally forbids the state legislature itself from exercising unless statewide interests are at stake. *See Bd. of Educ. v. Naugatuck*, 268 Conn. 295, 307 (2004) (noting that under the Home Rule Act, "a state statute 'cannot deprive cities of the right to legislate on purely local affairs germane to city purposes'" and so "'a general law, in order to prevail over a conflicting charter provision of a city having a home rule charter, must pertain to those things of general concern to the people of the state'"

(quoting *Caulfield v. Noble*, 178 Conn. 81, 87 (1979))).[6]

Other aspects of the Oversight Board confirm that it serves a state-government function rather than a local one.  The Special Act charges the Attorney General with defending "[t]he secretary [of OPM], the State Treasurer, the board and any person authorized to act on behalf of or to assist them, or any staff person for the board" in Board-related suits.  Special Act § 17(a).  The State is compensated by the defendant for the costs of providing such a defense only if the defendant is found liable.  *Id.*  Furthermore, in response to requests from the Board, the Attorney General has on two occasions issued formal legal opinions regarding Board-related matters.  *See* Attorney General's Opinion, Letter to Marc S. Ryan, Secretary, Office of Policy and Management (Mar. 15, 2002), available at http://www.ct.gov/ag/cwp/view.asp?A=1770&Q=281894; Attorney General's Opinion, Letter to Michael J. Cicchetti, Undersecretary, Office of Policy and Management (July 2, 2004), available at http://www.ct.gov/ag/cwp/view.asp?A=1770&Q=282008.  And the Attorney General may "apply for a writ of mandamus or seek a temporary or permanent injunction on behalf of the [oversight] board requiring any official, employee or agent of the city to carry out and give effect to any order of the board authorized by [the] act."  Special Act § 17(b).

Analogously, state law requires the Attorney General to appear on behalf of state officials and departments in civil proceedings.  *See* Conn. Gen. Stat. § 3-125 (requiring the Attorney General to "appear for the state, the Governor, the Lieutenant Governor, the Secretary, the Treasurer and the Comptroller, and for all heads of departments and [other state officials] in all suits and other civil proceedings . . . in which the state is a party or is interested, or in which the official acts and doings

---

[6] On November 30, 2000, the City passed a resolution waiving home rule and requesting that the State "take[ ]over" the City.  *See* Dakers Aff. ¶ 22; Notice of Manual Filing [doc. #77] Ex. D.

of said officers are called in question"). The Attorney General is also obligated to render "[a]ll legal services required by [state] officers and boards in matters relating to their official duties" and to "give his opinion upon questions of law submitted to him by either" house of the General Assembly or by legislative leaders. Conn. Gen. Stat. § 3-125. By contrast, the Attorney General does not appear on behalf of municipal bodies or provide them with legal services.

Furthermore, the Oversight Board is required to report to the Governor and General Assembly on a regular basis. *See* Special Act § 11(a)(17). That reporting obligation is indicative of the Board's status as a state entity, since other state entities are subject to a similar requirement. *See* Conn. Gen. Stat. § 11-4a (providing for certain state agencies, commissions, task forces, and committees to submit reports to the General Assembly); *see also Walker v. Connecticut*, 106 F. Supp. 2d 364, 369 (D. Conn. 2000) (concluding that "[t]here can be no doubt that the Sheriff's Advisory Board is a state agency," in part because "it is mandated that the Board submit an annual report to the Governor").

Therefore, because the Board was created to deal with a problem of statewide import, wields extensive oversight powers not possessed by any local entity, and interacts with state officials and the General Assembly as if it were a state entity, the Court concludes that the fourth *McGinty* factor weighs in favor of Eleventh Amendment immunity. *See McGinty*, 251 F.3d at 98.

**E.     Whether the State has a veto power over the entity's actions.**

The State does not possess a direct veto over the Oversight Board's actions. However, before the Board issues interim funding obligations or deficit funding bonds, the Special Act requires that "[a]ny such funding obligations or deficit funding bonds so authorized by the board . . . be subject to the approval of the [OPM] Secretary and the State Treasurer." Special Act § 3(a). Moreover,

14

before deficit funding bonds are issued, the Board must submit a report to the Treasurer and OPM Secretary in which the Board must affirm: that it has reviewed and approved the City's financial plans; that pension funds have been properly funded; that the city is not in default in its obligations ("unless issuance will cure the default"); that sufficient taxing authority exists to produce needed revenues; and that "the financing is in the public interest." Special Act § 7. Thus, the Act imposes limitations on the Board's powers that deny it "unfettered discretion." *McGinty*, 251 F.3d at 99 (finding that the fifth factor "tips toward immunity" because "while it does not appear . . . that absolute veto power exists over decisions made by the comptroller in his capacity as administrator and trustee of the Retirement System, nonetheless the acts of the legislature, the oversight of the superintendent of insurance, and the contractual relationship created by New York's constitution restrain the comptroller from the exercise of unfettered discretion").

Moreover, the life span of the Board is subject to State control. The Board remains in existence only until specific conditions prescribed by the legislature are met. Special Act § 14(a). And once the Board's existence has been terminated, the Special Act gives the OPM Secretary discretion whether to reestablish the Board upon a finding that the City has fallen short of certain financial benchmarks. *Id.* § 14(b). Finally, because State officials, designees, or appointees comprise six of the Board's seven members, the State exercises a considerable measure of influence over Board actions. *See Chafetz*, 2000 WL 1277337, at *4 (noting under the fifth factor that "the Governor has the power to appoint almost the entire Board of Directors of [the entity in question], with state officials serving as the remaining members ex officio"). Therefore, although the State has no direct statutory veto over the Board, the State retains other avenues of control such that the fifth *McGinty* factor tilts in favor of recognizing the Board's immunity. *See McGinty*, 251 F.3d at 99.

15

### F.    Whether the entity's financial obligations are binding upon the state.

*McGinty*'s sixth factor is "the single most important." *Feeney v. Port Authority Trans-Hudson Corp.*, 873 F.2d 628, 631 (2d Cir. 1989); *see also Hess v. Port Authority Trans-Hudson Corp.*, 513 U.S. 30, 48 (1994) (characterizing "the vulnerability of the State's purse as the most salient factor in Eleventh Amendment determinations");  Brief in Opposition to Motion to Dismiss [doc. #68] at 2 (describing the sixth factor as "crucial").  The Second Circuit has explained that the "relevant question with respect to this sixth factor is 'whether a judgment against the [entity in question] would have the practical effect of requiring payments from [the State].'" *McGinty*, 251 F.3d at 99 (quoting *Mancuso*, 86 F.3d at 296)).  For "the prevention of federal-court judgments that must be paid out of a State's treasury" was "the impetus for the Eleventh Amendment." *Hess*, 513 U.S. at 48.

Plaintiffs argue that the sixth factor points away from immunity because, while the State must pay any judgment the Court might render against the Board, the Special Act obligates the City to reimburse the State.  According to Plaintiffs, the City's obligation to reimburse the State means that any judgment of this Court that is paid by the State will have no effect on the state fisc.  However, the Supreme Court has rejected the notion that "the presence or absence of a third party's undertaking to indemnify the agency should determine whether it is the kind of entity that should be treated as an arm of the State." *Regents of the Univ. Of Calif.*, 519 U.S. at 431.  In *Regents of the University of California*, the plaintiff argued that the defendant University of California was not entitled to Eleventh Amendment immunity – even though a judgment against the University would be binding on the State – because the Federal Department of Energy was contractually obligated to reimburse the State for any such judgment.  Rejecting plaintiff's contention, the Supreme Court held that  the

16

"Eleventh Amendment protects the State from the risk of adverse judgments even though the State may be indemnified by a third party." *Id.* ("[W]e reject respondent's principal contention – that the Eleventh Amendment does not apply to this litigation because any award of damages would be paid by the Department of Energy, and therefore have no impact upon the treasury of the State of California."). Thus, the Supreme Court instructed courts that "with respect to the underlying Eleventh Amendment question, it is the entity's potential legal liability, rather than its ability or inability to require a third party to reimburse it, or to discharge the liability in the first instance, that is relevant." *Id.*; *see Duke v. Grady Mun. Schools*, 127 F.3d 972, 981 (10th Cir. 1997) ("[W]hile such a focus in some ways ignores economic reality, it also provides a clear and workable test in this very confused area of the law").

Because the rule focuses on whether the state is liable for an adverse judgment as an initial matter – rather than on whether or how the state may be reimbursed – the Eleventh Amendment immunity determination does not depend on whether reimbursement arises by contract or statute. In both instances, a federal court judgment against the entity seeking immunity would compel the state to act in order to comply with the court's judgment. *See Dugan v. Rank*, 372 U.S. 609, 620 (1963) ("The general rule is that a suit is against the sovereign if . . . the effect of the judgment would be 'to restrain the Government from acting, or to compel it to act.'" (quoting *Larson v. Domestic & Foreign Corp.*, 337 U.S. 682, 704 (1949))); *cf. Jackson v. Georgia Dept. of Transp.*, 16 F.3d 1573, 1577 (11th Cir. 1994) (denying immunity to state employees, even though the state was statutorily obligated to reimburse them out of an insurance trust fund, because a court judgment against the employees would not "compel[] the state to act"). And in each instance, a judgment against the entity claiming immunity would be paid, at least initially, out of the state's treasury. *Cf. Sales v.*

17

*Grant*, 224 F.3d 293, 297 (4th Cir. 2000) (rejecting immunity for defendants sued in their individual capacities even though "under [state] law, any monetary judgment against them would be paid out of a state-funded insurance plan . . . by a check drawn on the state's general treasury"); *Jackson*, 16 F.3d at 1576-77 (same) . Therefore, because it is undisputed that the State would be forced to satisfy any judgment rendered against the Board, the sixth *McGinty* factor strongly favors immunity. *See McGinty*, 251 F.3d at 99-100.

**G.     Summary**

To varying degrees, the first, second, fourth, fifth and sixth *McGinty* factors all favor the Oversight Board's assertion of Eleventh Amendment immunity. The third factor is neutral, neither favoring nor disfavoring immunity. The Second Circuit has not explained exactly how unequivocally the *McGinty* factors must tilt towards immunity in order for a court to conclude that the factors "point in one direction." *McGinty*, 251 F.3d at 96. The Court notes, however, that the Second Circuit and other courts in this district have accorded Eleventh Amendment immunity to defendants based on the first phase of the *McGinty* test where fewer than all six factors pointed towards immunity. *See, e.g.*, *Hapco Farms, Inc. v. Idaho Potato Com'n*, 238 F.3d 468, 468 (2d Cir. 2001) (affirming dismissal of a complaint against a defendant on immunity grounds where the "first, second, fourth, and sixth [*McGinty* factors] weigh in favor of the conclusion that [the defendant] is a state agency"); *Chafetz*, 2000 WL 1277337, at *4-*5 (finding the six-factor inquiry to be "dispositive" where "three of the six factors identified in *Feeney* [including the sixth] weigh strongly in favor of immunity, two weigh slightly against it, and the factor third is inconclusive"). Nothing in the case law suggests a rigid requirement that every factor must point in the direction of immunity, and the Court declines to adopt one where, as here, all factors point strongly in favor of immunity

except one, which is neutral.

Therefore, the Court finds that the clear weight of facts and factors compel the conclusion that the Oversight Board is an "arm of the state" and that it is entitled to the Eleventh Amendment immunity of the State of Connecticut. *See McGinty*, 251 F.3d at 100; *Hapco Farms*, 238 F.3d at 468. As a consequence, the Court must dismiss Plaintiffs' lawsuits against the Oversight Board for lack of subject matter jurisdiction.[7]

### III.

The Court GRANTS the Oversight Board's Motions to Dismiss [*Walker* doc. #64]; [*Laccone* doc. #38]; [*Brown* doc. #21]. The Court directs the parties to file simultaneous briefs in *Walker*, *Laccone*, and *Brown* **by March 1, 2006**, addressing the effect of the Oversight Board's dismissal on the maintenance of these actions against the remaining parties under Rule 19(b) of the *Federal Rules of Civil Procedure*.

IT IS SO ORDERED,


/s/      Mark R. Kravitz
United States District Judge


**Dated at New Haven, Connecticut on: February 21, 2006**.

---

[7] Because the Court has determined that the Board is a state agency immune from suit under the Eleventh Amendment, the Court need not consider the Board's alternative argument that it is not a "person" as that term is used in 42 U.S.C. § 1983.